## Hennessey et al. v. City of Philadelphia et al.

*Simon Pearl*, for plaintiffs.

*Francis F. Burch*, city solicitor, for defendants.

FLOOD, J., April 25, 1940.—Plaintiffs, who are candidates for the office of patrolman in the City of Philadelphia, filed a class bill alleging that they took the civil service examination for patrolman in the City of Philadelphia in August and September 1939; that they were thereafter formally notified that they were entitled to ratings on the eligible list; that on December 26, 1939, an eligible list was published and posted upon which their names and the averages obtained by each of them appeared, the averages in each case being above 70. They further alleged that contrary to law the civil service commission ordered a "re-physical examination"; that plaintiffs appeared for the physical reëxamination; that they were not notified to appear for the mental reëxamination; that their names did not appear upon the new eligible list published after the reëxamination; and that they have no physical defects disqualifying them from performing the duties of patrolman, but they were informed that they had failed to qualify physically. Plaintiffs seek a preliminary injunction restraining the commission from certifying any names to the director of public safety from the second published list and restraining the other defendants from acting upon or recognizing that list in any way. After the filing of the bill, the civil service commission certified names from the second list to the director of public safety, while the latter appointed 54 men. At the hearing the bill was amended to set up this fact and to pray that the city controller, one of the

defendants, be enjoined from permitting any payments to be made to the persons so appointed, and that the appointments so made be declared invalid.

The city filed preliminary objections to the bill prior to the hearing on the preliminary injunction, based upon the theory that the action of the civil service commission in this matter was discretionary and could not be interfered with by an order of the court.

A hearing was held on the rule for preliminary injunction at which the facts were developed.

Some 20,000 persons applied to take the first examination which the commission ordered when informed that there were a number of vacancies in the position of patrolman. All of these 20,000 were given a physical examination and something less than 7,000 were reported as passed. These 7,000 were then given mental and other tests, which 5,500 of the 7,000 were reported to have passed with grades of 70 or better. Plaintiffs were among those who passed these tests, and most of them received ratings well up on the list, the five original plaintiffs running from no. 165 to no. 619 and one of the added plaintiffs being no. 47 on the list. These examinations were given in October 1939. On December 26, 1939, an eligible list was published containing plaintiffs' names with the ratings above mentioned.

Before any names had been requested by the director of public safety or certified from this list, a new commission took office. Two of its members had not been members of the old commission, and the third, though a member of the old commission, had not signed the eligible list of December 26, 1939. Shortly after the new commission took office, complaints were made as to irregularities in the examinations and the preparation of the list. In examining the papers in its files as a result of these complaints, the commission found that there had been widespread changing of the grades on the computation sheets.

It appears that the examination was divided into five parts: (1) Training and experience; (2) practical questions; (3) observation test; (4) physical examination, given preliminarily and listed as "physical fitness" in computing the final grades; and (5) personal interview. After these tests had all been given, the results were listed on what is known as a computation sheet. On this sheet were nine columns. The first contained, in order, the examination numbers given to the applicants. The second and third columns were blank. The fourth, fifth, sixth, seventh, and eighth contained the applicant's rating for each of the five tests in the order named above. In the ninth column these five test ratings were averaged. The average so obtained, and appearing in the ninth column, determines the rating of the applicant. From these computation sheets the eligible list was made up.

On examining the computation sheets which had been filled in with lead-pencilled figures, the commission found many erasures. They also found that many grades had been obviously marked up. For example, in many cases, the figure nine had been crudely superimposed upon a seven, so as to change a grade from 75 to 95 or from 70 to 90. Taking a single example, the man who was rated no. 3 on the list appears upon the computation sheet to have received 90 for physical fitness. There appears, however, to be an erasure, and no magnifying glass is needed to read the underlying 70. An examination of the original physical examination chart signed by the doctor shows that this man was given a grade of 70.

Similar erasure and changed grades on the occupation sheets appeared in the case of 40 of the 90 names highest on the list. In many of the 40, the grade on the computation sheet for physical fitness does not agree with that on the original physical chart, made by the doctor.

Among those 40 names, there are certain other obvious peculiarities. A man well up on the list received 95 for training and experience. He stated that he was presently occupied as a waiter and his previous experience

was secured as a driver and salesman for various laundry and trucking companies and as a gas station attendant. He had no military experience or any other experience that would qualify him particularly as a patrolman. Many other irregularities of this and other sorts appear among these names.

It is also significant that no grades appear to have been altered so as to make them lower. All were altered by increasing the mark.

Under such circumstances it is futile to say, as former Commissioner Bryant suggested on the stand, that these computation sheets were in the nature of work sheets and that the erasures had no significance. It is quite clear that the examination or at least the computation of the marks was full of gross irregularities, and it is difficult to escape the conclusion that there was widespread fraud in the preparation of the first eligible list.

Having discovered these discrepancies, the commission, in an attempt to check the computation sheets, undertook an inspection of the original papers.

That part of the examination dealing with practical questions was of the essay type and the grades given in this test largely depended upon the reaction of the examiners. Consequently it is impossible to determine whether they were or were not properly graded. The same thing is true of the personal interview rating and the observation test. The latter consisted in taking an applicant into a room and thereafter asking him what he had observed there. We have mentioned above one of the extraordinary ratings in the training and experience category. There are others.

The commission also found that many of the physical examination charts were not filled out. Many of those submitted to us are almost completely blank except for the average at the bottom. This applies to many of the first 90 names on the eligible list other than the 40 above referred to. Commissioner Walnut testified that these charts were not properly filled out in several thousand

cases out of the seven thousand who were passed physically.

In addition, an inspection of these physical charts shows many sevens transformed crudely into nines in the final marks, changing grades of 70 to 90, and grades of 75 to 95. This also applies to many of the first 90 names other than the 40 above referred to.

We thus have an eligible list made up as a result of a procedure in which there were the most flagrant irregularities. Of the first 90 names, 38 appear on their face to have been improperly rated as a result of tampering with the computation sheets. At least 14 contained changed marks on the face of the physical charts. Twenty-one physical charts were not filled in and the city solicitor stated without opposition that in many of the cases in which the charts were not filled in the examinations were not actually made but were taken from other examinations of the same persons made more than two years before. Altogether, out of the first 90 on the list, 61 are seriously irregular on their face. Even more startling is the fact that eight of the first ten names contain irregularities of the sort above mentioned, and there is some indication of irregularity in a ninth.

The commission at first sought to correct these errors by striking from the list those names which were not properly there. A further investigation, however, made it clear that no one could ascertain with any degree of certainty which marks had been altered, and that procedure was abandoned as impracticable.

The commission then decided to rerate all the papers. Upon investigation of the papers, however, the commission decided that this was not feasible either, since in the essay type of examination each man is rated against every other man, and different examiners are likely to give different ratings to the same paper. This plan was therefore also discarded.

The commission then decided to adopt the procedure which it subsequently carried out. A "re-physical exam-

ination" was ordered, and all of the 7,000 applicants who had passed the first physical examination were notified to appear. Roughly, 5,000 took the physical reëxamination and of these some 2,300 failed to pass. Among the 2,300 were plaintiffs in this case. Those who passed were then given a mental examination stated to be a combination of practical questions and training and experience. This time the examination was of the "yes" and "no" type. The personal interview and the observation test were eliminated. Physical fitness was then given a weight of 40, and the mental test a weight of 60 in computing the final average. As a result, a new eligible list was prepared and published, and upon request of the department of public safety the commission, after the filing of the bill in this case, certified names to the director from the second eligible list from which the latter has appointed a number of patrolmen.

Plaintiffs' contentions are that the commission has no discretion to refuse to certify names from the eligible list published on December 26, 1939. Its discretion is limited, say plaintiffs, to striking from that list for definite and specific cause, as set forth in the Civil Service Act and the rules of the commission, any names which were improperly upon the list or to rerate those which had been rated improperly.

1. The classified civil service in the City of Philadelphia is governed by article XIX of the City Charter Act of June 25, 1919, P. L. 581. The matters with which we are here concerned are covered in sections 13 and 14 of that act, 53 PS §§3333-3334. Under these provisions, the commission is directed to hold examinations whenever necessary to provide eligibles for the positions covered by the act. It is mandatory upon the commission to prepare an eligible list for each position within 60 days after the examinations have been held for that position. There is no provision in the act for discarding an eligible list, but it provides that the commission may make rules which will have the force of law providing for the method of creating

the eligible list and provides that such lists shall not remain in force for more than two years. The commission has adopted a rule that an eligible list shall remain in force for not less than one year and that rule is now in effect. As a result there is no specific provision in the act or the rules permitting the cancellation of the eligible list within a year and the commission has not pointed to any provision of the act or of the rules to justify its action.

The act also provides that the commission may make rules providing for the rejection of candidates or eligibles who fail to comply with the reasonable requirements of the commission in regard to age, residence, sex, or physical condition and certain other matters, and the commission has adopted rules pursuant to that authority. If it had acted under such authority, normally its action could not be questioned: Gerson v. Daly et al., 337 Pa. 346 (1940). But the commission, speaking through Commissioner Walnut, expressly stated that it was not acting under these provisions.

Commissioner Walnut stated upon the stand that the commission had determined that it could not certify from the first list because so many irregularities were present that it was not a real eligible list at all. The commissioners, therefore, decided that they would be obliged to disregard it and proceeded to prepare a new eligible list. As we have said above, there is no authority given to the commission under the act or its rules to proceed in this way if the first list was a real eligible list. If it was, all appointments must be made from it, at least until December 26, 1940. The commission's action in this regard is not the sort of quasi-judicial proceeding which the court has no power to question if there is any evidence upon which to base the commission's findings, as in the case of its decision upon a demotion or a removal: cf. Lowrie's Appeal, 338 Pa. 203. It is rather an administrative act as to which the commission has no discretion.

To permit the striking down of a real eligible list within the period during which it has validity under the rules would permit the complete nullification of the merit system in civil service appointments. It would permit a commission unsympathetic with the purpose of the act to discard list after list until it finally got one to its liking. It is for this reason, of course, that neither the act nor the rules make any provision for the striking down of a list once it has been published. Consequently we must hold that the commission has no power to strike down the list, if it was a real eligible list.

2. The commission was in our opinion correct in its conclusion that the list published on December 26, 1939, was in no real sense an eligible list. To use the powers of a court of equity to compel the commission to certify from a list so tainted throughout its entire length would be a mockery.

The case which plaintiffs cite as sustaining their position actually supports the contrary position. In that case, People ex rel. v. McBride et al., etc., 226 N. Y. 252, 123 N. E. 374 (1919), the Court of Appeals of New York construed a statute having provisions substantially identical with those which we are considering. It affirmed the lower court's decision that the irregularities involved had to do with the certifications made after the eligible list had been prepared and therefore did not affect the eligible list. The opinion states, however, that after the eligible list has been prepared error may be corrected by setting it aside if it was the result of illegality, irregularity in vital matters, or fraud.

Where, as here, the irregularities are so widespread and it appears that fraud was perpetrated by some person or persons upon a large scale, we must agree with the commission's position that it could not certify from such a so-called eligible list, and that it was obliged to prepare a new and proper eligible list.

3. Plaintiffs have introduced evidence which indicates that some serious errors were made in the physical re-

examination. There was evidence that several of the plaintiffs were examined by other doctors at the time of the reëxamination or thereafter and were found to be physically sound whereas the examination showed them not physically fit. On the other hand, not all of the plaintiffs proved that they met the requirements of the commission in all respects. The commission should, of course, investigate such cases and upon the stand promised to do so. However, the conduct of these examinations is a matter within the commission's discretion and cannot be interfered with by us unless the court finds widespread irregularity or fraud to be present.

The proof offered with regard to the second examination falls short of what is necessary to establish fraud. The few instances of error with regard to plaintiffs themselves are, of course, not sufficient. That the commission has received 30 complaints is of no importance in itself in view of the fact that some 2,300 applicants were rejected. Especially is this true in the absence of data as to the validity of those complaints. The most serious question raised in the mind of the court as to the physical reexamination is the fact that it was under the direction of the same doctor who gave the first physical examination of August 1939, and who signed all of the physical charts prepared at that time. This in itself is not enough upon which to base a finding of irregularity. No evidence was submitted as to any irregularity with regard to the mental tests, which were taken by none of the plaintiffs since they did not pass the physical reëxamination. In fact, the mental reëxaminations were supervised by volunteer examiners and not by the same persons who had given the tests in the fall of 1939. Therefore, we must hold that the evidence does not show any irregularities in the second list of a nature that would warrant our enjoining the commission from certifying from it. Therefore, no preliminary injunction will issue.

Plaintiff's rule is discharged and the preliminary injunction is denied.